UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN G. OKONOWSKI, D.D.S.,

       Plaintiff,

vs.                                         Case No.

CERTAIN UNDERWRITERS           HON.
AT LLOYD'S, LONDON,

       Defendant.

---

Troy W. Haney (P48614)
HANEY LAW OFFICE, P.C.
Attorney for Plaintiff
330 East Fulton Street
Grand Rapids, MI 49503
Telephone:    616-235-2300
Facsimile:     616-459-0137
Email:  thaney@troyhaneylaw.com

---

## **COMPLAINT**

     Plaintiff, John G. Okonowski, D.D.S., by his attorney, Troy W. Haney of Haney Law Office, P.C., and for his complaint against Defendant, Certain Underwriters at Lloyd's, London, for their breach of contract by their failure to pay a Lump Sum Disability benefit under an Individual Disability Policy of Insurance, and states as follows:

### **Parties**

1.    Plaintiff, John G. Okonowski, D.D.S., is an adult and legally-competent individual who has resided in Grosse Pointe Shores, Michigan at all times relevant to this litigation.

2.    Defendant, Certain Underwriters at Lloyd's, London, is a surplus lines insurer permitted to do business in the State of Michigan as well as other states in the United States.

3.     Upon information and belief, at all times hereinafter mentioned, the Defendant was and is an unincorporated syndicate of members, both corporate and individuals, comprised of citizens and subjects of foreign states or citizens of the United States.

4.     Upon information and belief, Defendant underwrites in syndicates on whose behalf professional underwriters accept risk. The risks placed with underwriters originate from clients and other brokers and intermediaries all over the world.

## Jurisdiction and Venue

5.     At all times relevant hereto, the Defendant has regularly and systematically solicited and conducted business in the State of Michigan, thereby vesting this Court with authority to exercise personal jurisdiction over the Defendant.

6.     As codified in 28 U.S.C. Section 1332, this Court has subject-matter jurisdiction over this litigation based on the amount in controversy exceeding a value of $75,000, exclusive of costs and interest, and the diversity of citizenship between Plaintiff and Defendant.

7.     As the actions and/or omissions giving rise to Plaintiff's claims as recited herein occurred in this judicial district, venue is proper in the Western District of Michigan pursuant to 28 U.S.C. Section 1391(b).

## Factual Background

8.     The dispute giving rise to this litigation involves a disability income insurance contract (hereafter "the Policy") between the parties, issued by the Defendant directly to the Plaintiff as an individual, and bearing an effective date of issue of October 11, 2013 and Certificate No. 1368236.

9.     The Policy was purchased by the Plaintiff as an individual and was not provided and paid for as an incident of his employment, and as such, it is a matter of private contract.

10.     The Plaintiff continuously paid the premiums on the Policy from the date of issue through the date of his disability.

11.     In the event of a claim for benefits from the Policy, a third-party administrator ("TPA"), Disability Management Services, Inc. ("DMS"), functions as the claims administrator during the claim process and the administrative appeal process.

12.     At issue in this case is the Policy's provision for a "Sickness and Injury Lump Sum Disability Benefit" ("LSD benefit"), which provides a one-million-dollar ($1,000,000.00) lump sum payment in the event the Plaintiff continues to be Permanently Totally Disabled from his occupation after a period of disability of sixty-three (63) months. The provision states as follows:

> We will pay the Principal Sum Amount as indicated in the Schedule of Benefits following the Elimination Period, if Competent Medical Authority determines You to be Permanently Totally Disabled.
>
> Permanent Total Disability must occur while this Certificate is in force and which is a result of a Sickness or Injury that is first diagnosed by a Physician while this Certificate is in force or if a Sickness or Injury is first diagnosed by a Physician while this Certificate is in force then you must be declared to be Permanently Totally Disabled within 365 days from the date of the first diagnosis if that occurs beyond the expiry date of the Certificate.
>
> To be eligible for the Principal Sum benefit, You must be under the Regular Care of a Physician. If in the opinion of the Physician providing Regular Care, future or continued treatment would be of no benefit to You, Regular Care shall not be required.
>
> We reserve the right to have You examined by another Physician of Our choice. Should Your Physician and Our Physician not be able to agree that You are Permanently Totally Disabled, Your Physician and Our Physician shall name a third Physician to make a decision on the matter which shall be final and binding.

13.     The Policy states that "Permanent Totally Disabled" is defined as follows:

> **Permanent Total Disability** means that if solely due to a Sickness or Injury, You are not able to perform the substantial and material duties of Your Occupation and in the opinion of Competent Medical Authority recovery from such disability is not expected, even if You are at work in another occupation.

14.     The Policy states that "Physician, Competent Medical Authority" is defined as follows:

**Physician, Competent Medical Authority** means an individual who is qualified to perform or prescribe surgical or manipulative treatment. A Physician must be recognized (licensed and chartered) by the state or country in which he or she is practicing, cannot be You or a relative of Yours and must practice within the scope of his or her license. Treatment of a Sickness or Injury must be within the knowledge or expertise of the Physician.

15.    The Policy also states that "Your Occupation" is defined as follows:

**Your Occupation** means the occupation (or occupations, if more than one) in which You are gainfully employed for the majority of the time during the 12 months prior to the time You become disabled. If You have limited Your Occupation to the performance of the substantial and material duties of a single specialty We will deem that specialty to be Your Occupation provided that Your industry widely recognizes that occupation as a specialty.

16.    The Plaintiff is a Dentist who practiced general dentistry for nearly thirty years until his last day of work on September 8, 2015.

17.    On December 6, 2012, the Plaintiff woke up with right leg numbness and foot drop. He subsequently had back surgery on December 28, 2012, for a laminectomy at L4-L5 and L5-S1.

18.    On November 7, 2014, the Plaintiff began having issues with hand numbness, leg numbness, and neck pain.

19.    Over the following months, the Plaintiff continued to treat with his attending physicians, who have described the Plaintiff's condition in various test results, office visit notes, and questionnaire forms, stating in part,

**November 25, 2014: Electromyography[1] ("EMG") – Joseph Femminineo, M.D.**
**Impression:** Abnormal Exam. Findings are consistent with evolving distal [peripheral] sensory neuropathy[2] with no signs of active denervation. Clinically

---

[1] Electromyography (EMG) measures muscle response or electrical activity in response to a nerve's stimulation of the muscle. The test is used to help detect neuromuscular abnormalities.
https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/electromyography-emg

[2] Peripheral neuropathy, a result of damage to the nerves located outside of the brain and spinal cord (peripheral nerves), often causes weakness, numbness and pain, usually in the hands and feet. It can also affect other areas and body functions including digestion, urination and circulation. Your peripheral nervous system sends information from your brain and spinal cord (central nervous system) to the rest of your body. The peripheral nerves also send sensory information to the central nervous system.
https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061

patient has signs of increased tone right lower extremity suggesting a central issue as well.

**December 11, 2014 – Office Visit Notes – Matthew Voci, M.D.**
Severe sensorimotor neuropathy. This sensorimotor neuropathy [is] separate and distinct from the underlying spinal issues which provides its own degree of physical impairment. This neuropathy has led to a decrease in fine and gross motor function of the extremities.

PHYSICAL EXAM: [Left upper extremity] strength 3-4/5, with more weakness noted to tricep and bicep.

**January 23, 2015 – Office Visit Notes – Matthew Voci, M.D.**
**Patient presents for reevaluation of his severe polyneuropathy that has seemingly gotten much worse since November 2014.** He has very significant lack of sensation about left distal foot with less numbness present about right foot. He has fallen and now his left hand-thumb, first and 2nd fingers are giving him dexterity and grip issues. **He is a dentist and has been finding himself dropping instruments in people's mouths.** He did have laminectomy about L4-S1 2 years ago by Dr. Zinkle. EMG has shown significant neuropathy in [bilateral lower extremities] and [right upper extremity]. (Emphasis added).

**July 6, 2015 – Office Visit Notes – Matthew Voci, M.D.**
Patient presents for reevaluation of his polyneuropathy. No pain - just numbness. He notices a fluttery sensation about bilateral arms. He is stating that is causing him intermittent depression alongside intermittent femoral [pulsating] sensation. The patient has had an EMG which shows neuropathy about [bilateral lower extremities] and [right upper extremity]. He works as a dentist and is feeling that this neuropathy is causing him to not attain his goals at work.

**July 24, 2015 – Attending Physician Statement – Matthew Voci, M.D.**
**Objective Findings:** EMG [bilateral lower extremities] and [right upper extremity]; Severe sensorimotor neuropathy; neuropathy disease labs; decreased sensation to light touch and pin prick; [left upper extremity] weakness to tricep, 3-4/5.

**When do you expect the patient to be able to return to work? Never. [Patient] will continue to progress from disease.** (Emphasis added).

20. As a result of the Plaintiff's ongoing medical conditions, the Plaintiff came to the realization that he could no longer provide even basic dental examinations in a safe manner for his patients.

21. In August 2015, the Plaintiff began the process of transitioning out of dentistry. This included referring his patients out to other dentists in the area, and by submitting his application for disability benefits from the Policy, which provided the Plaintiff with a monthly disability benefit if he is unable to perform his own occupation, and for a period up to sixty (60) months.

22.   On August 1, 2015, the Plaintiff completed an Occupation Duties Form as part of the application process, in which he explained that 90% of his work involves operative procedures (e.g. root canals, fillings, implants), and that it is difficult for him to hold instruments (e.g. files, mirrors, drills, explorers, abutments, small screws, etc.) and that these items have occasionally fallen while he was performing procedures. The Plaintiff also explained that he cannot operate the rheostat (the foot-pedal used to operate a dental drill) at proper speeds and/or stop quickly due to the numbness in his left foot. The other 10% of the Plaintiff's work is exams, and he explained that although he can perform exams mostly with one hand, it is difficult for him to palpate the left side of a patient's mouth for oral cancer due to the numbness in his left fingers.

23.   The Defendant approved the Plaintiff for monthly disability benefits effective December 9, 2015.

24.   Over the following five (5) years, the Plaintiff's medical conditions continued to disable him from performing his own occupation as a dentist, and the Defendant continued to approve the Plaintiff for the ongoing monthly disability benefit.

25.   During those five (5) years, the Plaintiff also continued to be treated regularly by his attending physicians, who in various office visit notes and questionnaire forms stated in part as follows:

> **November 13, 2015 – Progress Notes – Dr. Daniel Menkes**
> **INTERVAL SUMMARY:** The last visit rendered a hypothesized diagnosis of acute cervical transverse myelitis. The diagnostic testing was remarkable for the following: He had abnormal tibial [somatosensory evoked potentials] demonstrating evidence of large fiber sensory pathway dysfunction between the conus and the contralateral somatosensory cortex bilaterally. * * *
>
> **Sensory:** Intact... except for in the left median nerve territory distal to the palm. There is decreased vibration and position distal to the knee bilaterally more pronounced on the left. There is no sensory level.

**Cerebellar:** …There is bradykinesia[3] to these finger movements on the left. * * *

**IMPRESSION/MEDICAL DECISION-MAKING:** His history, examination and [somatosensory evoked potentials] are all supportive of a diagnosis of cervical transverse myelitis. * * *

**…I informed him that his fine manual dexterity is impaired to the point [that] I would not recommend that he do tasks requiring fine motor coordination.** (Emphasis added).

<u>**January 23, 2017 – Attending Physician Statement – Dr. Matthew Voci**</u>
**Symptoms observed by physician:** Bilateral arm weakness; numbness in both upper and lower extremities – constant with all extremities; leg spasms.

**Objective findings:** Diffuse [degenerative disc disease] with cervical, thoracic, and lumbar spine; S/P lumbar laminectomy;… sensorimotor neuropathy.

**Additional comments or progress: Patient will not improve – Unable to work.** (Emphasis added).

<u>**June 14, 2017 – Attending Physician Statement – Dr. Matthew Voci**</u>
**Symptoms observed by physician:** Impaired fine motor control hands; impaired stamina arm/legs.

**Objective findings:** [Somatosensory Evoked Potential] (2015) – impaired spinal cord signal transmission.

**Is the current plan of treatment expected to improve the patient's physical or cognitive function?** No. [Symptoms] are static, not reversible.

**Additional comments or progress: No improvement clinically. He is medically not able to return to any work.** (Emphasis added).

<u>**October 9, 2017 – Office Visit Notes – Dr. Daniel Menkes**</u>
IMPRESSION/MEDICAL DECISION MAKING:
His history, neurological examination and somatosensory evoked potential results are all compatible with a diagnosis of asymmetric cervical transverse myelitis. His examination has evolved in that he now no longer manifests weakness in his left upper extremity but there is some weakness in his left lower extremity that was not previously noted. There is also dystonic posturing of his left hand and left foot.

<u>**December 7, 2017 – Attending Physician's Statement – Dr. Daniel Menkes**</u>
**Dates patient was continuously totally disabled:** He is unable to practice as a dentist.

**When do you expect the patient to be able to return to work?** Never.

<u>**November 11, 2019 – Office Visit Notes – Dr. Daniel Menkes**</u>
IMPRESSION: He reports an increase in the symptoms of his transverse myelitis. Intravenous corticosteroid therapy would only be indicated if there were definite evidence of progression. He had an MRI of his brain last year that did not demonstrate any active demyelinating disease. However, his current symptoms are referable to the cervical and/or thoracic spine. As such, he agreed to undergo

---

[3] Bradykinesia is impairment of voluntary motor control and slow movements or freezing.
https://www.healthline.com/health/parkinsons/bradykinesia

a repeat MRI of his cervical and thoracic spine with gadolinium. If there is evidence of active demyelination, then I will initiate a course of steroids and discussed disease modifying therapy with him. He stated that his dystonic posturing in his left lower extremity does not trouble him enough that he would be willing to undergo symptomatic therapy with botulinum toxin at this particular point in time. He stated that he would contact me if he changed his mind regarding his therapy. He will continue his home physical therapy program as was prescribed to him in the past.

**January 22, 2022 – Attending Physician's Statement – Dr. Daniel Menkes**
**When do you expect the patient to be able to return to work?** Never.

**Additional Comments or Progress: This is a permanent condition that has reached maximum improvement. He has been unable to return to his usual occupation.** (Emphasis added).

**November 9, 2020 – Office Visit Notes – Dr. Daniel Menkes**
His only request is that I provide him a temporary disability placard because he is unsteady on his feet, which is a problem when there is significant ice and stone [on the] ground. I agreed to give him a temporary 6 month disability placard.

26.    On August 18, 2020, at the request of DMS, the Plaintiff attended an "Independent Medical Examination" ("IME"), with Daniel M. Ryan, M.D., who is a Physical Medicine & Rehabilitation physician. According to the Plaintiff, the entirety of the examination lasted less than 10 minutes. In his report, although Dr. Ryan was unable to reach any specific diagnoses or conclusions on specific restrictions and limitations, he did conclude in part as follows,

**EXAMINATION:** …He had sensory deficit in the left hand and his left foot as compared to the right hand and right foot… He had some giveway weakness with both dorsi and plantar flexion on the left. He had some giveway weakness with intrinsic strength in the left hand… his left hand overall looked smaller than the right… He was able to heel-walk with a little difficulty on the left. Toe-walking was more difficult and he was not able to fully do it on the left… had some weakness though somewhat giveway with opposition in the left hand. * * *

**SUMMARY:** At this time I would limit him in terms of repetitive motion including grasping, pushing and pulling with the left extremity. **Based on his complaints, this would limit him in terms of performing the skills necessary as a dentist.** (Emphasis added).

27.    On December 9, 2020, the Plaintiff reached the end of the 60-month period of eligibility for his monthly disability benefit. Subsequently, there remained an additional three-months in the 63-month elimination period required for the $1,000,000.00 LSD benefit. By this time, the Plaintiff had been diagnosed with the following medical conditions:

- Peripheral Neuropathy;
- Cervical Transverse Myelitis;
- Dystonia left hand and left toes;
- Lumbar spine stenosis;
- Cervical spine stenosis; and
- Paresthesia left upper extremity and bilateral lower extremities.

28. It should also be noted that there is a significant difference between motor deficits and sensory deficits. The Plaintiff does not appear to have substantial motor deficits, instead, he has sensory deficits, which in turn create small motor function issues but would be less likely to interfere with gross motor functioning, i.e. the difference between the fine motor skills necessary for performing delicate surgery in a small oral cavity, versus the gross motor skills necessary for general physical activities.

29. On December 11, 2020, Dr. Menkes issued a response letter to Dr. Ryan's IME report, stating as follows,

> I received a copy of Dr. Okonowski's independent medical evaluation today. I note that this physician was **Dr. Daniel Ryan, who is not a board-certified neurologist.** While Dr. Ryan is entitled to his own opinions, he is not entitled to his own facts.
>
> The somatosensory evoked potentials clearly document pathology within the large fiber sensory pathways of the central nervous system. The signs and symptoms reported by this gentleman clearly localized to the cervical spine and not to the peripheral nervous system. These findings could not be explained by a peripheral neuropathy as implied by Dr. Ryan. Notably, Dr. Ryan did not offer a specific diagnosis. He is free to disagree with my diagnosis but he needs to provide an alternative diagnoses, which is not in evidence.
>
> **Tactile sensation is very important for a dentist to be able to perform his regular occupation. Fine motor coordination is also very important. I have concerns regarding whether or not [Dr. Okonowski] could safely practice his usual occupation.**
>
> If you want an independent medical examination, then I strongly recommend referring him to a board-certified neurologist preferably one with expertise in central nervous system demyelinating disorders.
>
> Notwithstanding, my diagnosis of cervical transverse myelitis is supported by objective evidence whereas Dr. Ryan's statement that he has no diagnosis, while accurate, provided little value added benefit to this situation.

30.     On January 4, 2021, the Plaintiff emailed Catherine Alberti, a Senior Claim Consultant for

DMS, and personally responded to Dr. Ryan's IME, stating in part,

> First, his notations never mention my difficulties I experience with using fine motor skills of my fingers and foot due to my numbness. I clearly recall describing it to him during the initial questioning but do not see that in his notes. **I described the difficulties of holding toilet paper, buttoning shirts, etc., so as he could understand the day to day challenges I experience with my impaired fine motor skills.** Perhaps Dr. Ryan may be calling it "weakness" (please note "I never claimed weakness to be the reason for claiming long term disability"). When you read his report, on page 10, under summary, paragraph 2, again he describes it as weakness in my left hand (not fine motor skill impairment) as the reason I claim that I cannot perform my duties as a dentist, even though I am able to perform most normal daily activities. **I cannot emphasize enough to Dr. Ryan that manipulating dental instruments in my fingers is not the same as using a hammer, screwdriver, or a garden tool. I don't think weakness and fine motor skill/numbness are interchangeable descriptions of my condition.** For this reason, could you get clarification from him regarding the difference between weakness and fine motor skill impairment/numbness. This may help him make a more accurate evaluation and summary of my exam.

31.     Upon information and belief, on January 18, 2021, Dr. Ryan completed an addendum to

his IME report, however, a copy of the new report was never provided to the Plaintiff or

his attending physicians for an opportunity to review or respond to the report.

32.     On February 22, 2021, the Plaintiff was examined by Dr. Menkes, who stated in part in his

office visit notes,

> IMPRESSION –: There has been a change in his neurologic examination and that he is now manifesting weakness in his hand intrinsic muscles and finger extensors, which are innervated by the left C8-T1 nerve roots. * * *
>
> He does have a history of partial cervical transverse myelitis. He is now beginning to experience fasciculations from this condition. He also showed me a video of the left upper extremity hand tremor.

33.     On February 25, 2021, Ms. Alberti issued a letter to the Plaintiff and informed him that Dr.

Ryan had issued an addendum to his IME report. Based on Drs. Ryan and Menkes'

recommendations, she also informed the Plaintiff that she would be referring him to

another IME, this time with a board-certified neurologist. However, it should also be noted

that these actions were based on the inaccurate claim that "*the documentation received to

date does not support your Permanent and Total Disability to practice as a dentist*", which

is entirely false. Not only had the Defendant already approved the Plaintiff for five years of disability benefits due to his inability to continue practicing dentistry, but every single physician who has examined the Plaintiff, including IME Dr. Ryan, stated that he has limitations that would prevent him from performing dentistry.

34.    On March 9, 2021, the Plaintiff reached the end of the 63-month elimination period for the LSD benefit. Therefore, as of March 10, 2021, based on the opinions of every examining physician that the Plaintiff was no longer able to perform his own occupation of dentistry, the Plaintiff should have immediately been approved by the Defendant for the $1,000,000.00 LSD benefit.

35.    On March 9, 2021, the Plaintiff retained the undersigned to assist with the ongoing administrative process of his claim for the LSD benefit.

36.    On March 10, 2021, the Plaintiff submitted a "Position Letter" to DMS, stating in part as follows,

> I would note that Dr. Ryan's opinion, as a [Physical Medicine & Rehabilitation ("PM&R")] doctor, regarding the diagnoses made by Dr. Menkes, a neurologist is well outside of Dr. Ryan's area of expertise. Even so, Dr. Ryan's restrictions actually confirm that Dr. Okonowski cannot return to the practice of dentistry. As such, the limited extent to which Dr. Ryan's "opinions" vary from those of Dr. Menkes is not sufficient to trigger the "neutral" third physician opinion allowed by the terms of the policy. Said differently, the PM&R physician you hired actually confirmed that Dr. Okonowski was unable to safely practice dentistry. The fact that a PM&R physician is confused about a neurological diagnosis made by a board certified neurologist is quite irrelevant.
>
> In light of the above, there is absolutely zero basis to delay payment of the $1,000,000 lump sum. 60 months of monthly disability payments have already been made under the exact same definition of disability; zero medical improvement has occurred or even alleged occurred; the elimination period has been satisfied and there is no genuine dispute to justify involving the process of a third neurologist to opine on the matter.

37.    In March 2020, the Plaintiff had both a telehealth visit, and an in-person visit with a neurosurgeon, Fernando Diaz, M.D., who included in his notes in part,

**March 10, 2021 – Telehealth Visit Notes – Dr. Fernando Diaz**
**PHYSICAL EXAM:** This is a telehealth evaluation. – He has limitation of motion of his neck to flexion, extension and rotation. – He moves his upper and lower extremities symmetrically although he has delayed function in his left hand which is difficult to assess on a telehealth evaluation since he may have weakness.

**IMAGING:** An MRI of the cervical spine completed on 3/4/2021 reveals spondylitic disease from C2 to T12 most marked at C5-C6 and C6-7 with significant spinal cord compression at C5-C6 and C6-C7 in the high intensity signal suggestive of a Type 1 myelopathy.

**MEDICAL DECISION MAKING:**
I believe Dr. Okonowski will require a vertebral corpectomy of C5, C6 and C7 with anterior allograft arthrodesis and instrumentation. I believe he has significant evidence of myelopathic changes and the surgery probably should be done soon.

**ASSESSMENT/PLAN:**
1. Disorder of intervertebral disc at C5-C6 level with myelopathy.
2. Disorder of intervertebral disc at C6-C7 level with myelopathy.
3. Spondylosis with myelopathy.

**March 22, 2021 – Office Visit Notes – Dr. Fernando Diaz**
PHYSICAL EXAM: –. Except for a slight spastic gait, he has a tendency to drag his left foot. He has dyspraxia in the left hand that is unable to fully close his index and middle finger and has some difficulty with fine motor coordination.

38.    Despite the Plaintiff's position that an additional IME was not needed based on the

sufficient medical evidence that had already been provided, DMS insisted that an additional

IME from a neurosurgeon was necessary, and the parties mutually agreed upon a

neurologist, Michael Grof, D.O., to perform the additional IME.

39.    On August 10, 2021, the Plaintiff attended the IME with Dr. Grof. During the examination,

Dr. Grof confirmed many of the Plaintiff's issues with numbness in his hand and foot, but

also informed the Plaintiff that he did not agree with the specific diagnoses that had been

assigned to the Plaintiff's conditions.

40.    On September 13, 2021, Dr. Grof issued his report on his findings from his examination of

the Plaintiff. Rather than focusing on the issue of whether the Plaintiff's medical conditions

prevented him from being able to perform dentistry, Dr. Grof instead provided an

expansive and vitriolic 39-page single-spaced report where he criticized and critiqued in

detail the Plaintiff's attending physicians and their methodology. Dr. Grof also seems to be

uninformed about the definition of "Permanent Total Disability" within the Policy, as he repeatedly comments on the Plaintiff's ability to engage in physical activities that require gross-motor skills (e.g. golf, gardening, mowing the lawn, etc.) while utterly failing to address the only relevant issue, which is, the Plaintiff's ability to safely perform the fine-motor skills required in oral surgery. Ultimately, Dr. Grof admits that he does not have sufficient knowledge to offer an opinion on whether the Plaintiff's conditions disable him from performing dentistry, and instead recommends that the Plaintiff should have yet another IME, this time by someone with a specialty in dentistry, stating in part,

> …since I am not a dentist and do not know exactly what he is talking about when he claims that his left hand is the cause of his disability, despite the EMG findings and normal strength testing, it would be important to have the opinion of an independent dental IME reviewing these records to determine if whatever condition is affecting Dr. Okonowski is enough to really constitute total disability because of inability to control his limbs as a dentist. * * *
>
> I cannot totally conclude that [Dr. Okonowski] is capable of performing his job as a dentist.

41.    On November 8, 2021, the Plaintiff had an office visit with Dr. Menkes who charted as follows,

> **NEUROLOGICAL EXAMINATION:** …4/5 strength in left foot evertors, plantar flexors and toe flexors. He also manifests 4/5 weakness in left C8-T1 innervated hand muscles. These weak muscles have relatively preserved bulk and tone. There is mild dystonic posturing of his left hand and foot.
>
> SENSORY: …There is decreased vibration and position distal to the knee bilaterally more pronounced on the left. There is also reduced proprioception in his left great toe and left index finger.
>
> GAIT: Slight sensory ataxia… Tandem gait testing demonstrated an increasing sensory ataxia. He has dystonic posturing in his left lower extremity with stress gaiting.
>
> PRIMARY NEUROLOGICAL DIAGNOSIS FOR THIS DATE: Cervical transverse myelitis with myelopathy/right Morton's neuroma.
>
> IMPRESSION/MEDICAL DECISION MAKING: His cervical myelitis appears stable by both signs and symptoms. There has been no significant progression in his condition over the time that I have seen him. As such, he would not be a candidate for immunomodulatory therapy at this particular point in time.

42.    On November 16, 2021, DMS issued a letter to the Plaintiff denying his claim for the LSD

benefit based on the IME reports issued by Drs. Ryan and Grof. The letter stated in part,

> …based on the information we have gathered and reviewed, Certain Underwriters at Lloyd's, London determined that the Principal Sum Benefit for Permanent Total Disability is not payable… * * *

> Dr. Grof concluded that based on his neurological examination of Dr. Okonowski, and his review of the claim file, which included test results, medical and surveillance records, that Dr. Okonowski was not totally, temporarily, or permanently disabled as a dentist. Specifically, Dr. Grof wrote: "though [Dr. Okonowski] has many subjective complaints, he is lacking any significant objective findings to support his disability for performing his usual occupation as a general dentist. To my examination, he certainly is not totally disabled." In accordance with the Sickness and Injury Monthly Disability Benefits provision and the Sickness and Injury Lump Sum Disability Benefit provision, Dr. Grof's decision on the matter shall be final and binding. Dr. Grof concluded that Dr. Okonowski is not totally, temporarily, or permanently disabled as a dentist. Based on Dr. Grof's opinion as well as the information available regarding Dr. Okonowski's claim, Underwriters have determined that Dr. Okonowski does not meet the definition of Permanent Total Disability and his claim for the Principal Sum Amount of $1,000,000.00 is denied.

Notably, DMS has cherry-picked and distorted Dr. Grof's statements to make it appear that

he concluded that the Plaintiff is not totally disabled from dentistry – when in truth, Dr.

Grof's report clearly indicated that he did not have enough information or knowledge of

dentistry to reach a definitive opinion on the Plaintiff's ability to practice dentistry.

43.    On January 12, 2022, as part of the Policy's "Grievance Procedures", the undersigned

requested in writing an "Informal Review" of DMS' decision to deny the Plaintiff's claim

for the LSD benefit. The undersigned attempted to re-focus DMS' attention on the only

issue of relevance, whether the Plaintiff's medical conditions disabled him from safely

performing dentistry. The letter stated in part,

> In short, he lacks the ability to safely control small sharp dental instruments inside the small cavity of an adult or child's mouth. This seems obvious to all except for the two physicians Lloyd's paid to offer opinions. Even Lloyd's recognized this inescapable reality for the full initial term of this claim (60 months). Initially, Lloyd's hired a physician (a physiatrist rather than a neurologist or dentist) to review the records and opine on whether he is capable of returning to dentistry. Because the physiatrist disagreed with the treating physicians, Dr. Grof was identified by the undersigned as a neurologist that performs insurance IMEs and then retained by Lloyd's to offer the final "tiebreaking" opinion. On September 13, 2021, Dr. Grof

14

issued a 39-page report wherein he provided an opinion, based on incomplete medical records provided by Lloyd's, that reads like a vitriolic rant, on a multitude of irrelevant non-dentistry issues (for example general disability concepts and hobbies such as golf). On the only relevant issue, Dr. Grof confessed his ignorance and therefore did not offer an opinion. And yet, Lloyd's has attempted to hide behind Dr. Grof's report as if he did express a relevant opinion. * * *

Additionally, as part of Lloyd's referral process to Dr. Grof, we would like to know what information was provided to Dr. Grof regarding the Certificate's definitions for "Total Disability", "Permanent Total Disability", "Your Occupation", "Sickness and Injury Lump Sum Disability Benefit", and any other descriptions or definitions from the Certificate that may have been provided to Dr. Grof. Also, please advise whether Dr. Grof was provided with a job description for Dr. Okonowski, and if so, please provide us with a copy. We are asking for this information because after a thorough review of Dr. Grof's IME report, it is evident that his opinions lack an understanding of the requirements necessary to meet the terms for the Certificate's Lump Sum Disability Benefit, which was literally the only issue in question for Dr. Grof to address.

44.   In February 2022, Dr. Voci clarified the nature of the Plaintiff's medical conditions and explained exactly why they prevent him from performing dentistry. Specifically, Dr. Voci stated in part as follows,

- Dr. Okonowski performs delicate dental procedures with sharp instruments in a confined space, wherein he has to assume and maintain certain bodily postures that put a strain on the body, especially the spine and the upper extremities. He began to notice trouble in manipulating his instruments, raising concern that he could injure patients. **Such fine motor activities require not only delicate muscle movements but they rely heavily upon sensory feedback (proprioception) to help with guiding the movements of his fingers and the instruments they hold and manipulate.**

- In searching for other potential causes, we pursued imaging of his cervical spinal column. An MRI did show stenosis of a mild to moderate nature. One does not need to have signal changes in the spinal cord to have symptoms from stenosis. As well, remember that an MRI is done in a relaxed recumbent position. **In his profession, he spends significant time flexed forward at his neck, bent over his patients. During such flexion, there can occur more significant narrowing of the spinal column (dynamic compromise of the spinal cord). This was and still remains my greatest concern for why he had experienced difficulty in his profession.** In support of this, Dr. Menkes did find impairment of signal transmission in the spinal cord in the evoked potential study he performed. Again, it is not necessary to have signal change within the spinal cord to explain compromise of signal activity across the spinal cord.

- Regarding the peripheral neuropathy diagnosis… EMG are not sensitive for myelopathy. They instead focus on the peripheral nerve from the [dorsal root ganglion] out to the further periphery. Evoked potentials are better at identifying symptomatic spinal cord problems, but they are also inherently insensitive… **A sensory neuropathy would without question impair his ability to manipulate fine surgical instruments in the oral cavity as sensory position feedback**

**would be impaired.** Small fiber neuropathies may not have any abnormalities in the EMG, at least early on, possibly further on as well.

- **Reflex loss was identified by Dr. Grof in his exam. This reflects impairment to the peripheral nerve pathways and is consistent with our views that there exists a neuropathy… I do believe that the Cervical stenosis is significant and likely the main cause of his difficulties when he is bent over performing dentistry.**

- Sometimes, we have to deal with subjective symptoms. Given his occupation, we undertook appropriate investigations to address those symptoms. In the end, it is my belief that the cervical stenosis is causing intermittent compression of the cord when he flexes forward during dental procedures. Whether or not there exists a sensory neuropathy, the patient had been noticing greater difficulty performing his delicate dental procedures. In my professional capacity, I have to take these complaints seriously and weigh all aspects of their impact. **I stand by my views that he is not capable of carrying out his fine motor skills necessary to perform dental procedures. I was never asked to assess whether he would be able to pursue activities such as mowing the lawn or golfing. The fine motor control needed for such activities do not compare to dental procedures.** (Emphasis added).

45. On March 10, 2022, DMS issued a letter to the Plaintiff, informing him that it had reviewed his "Informal Appeal", and that it had maintained its decision to deny his claim for the LSD benefit, and that his claim remained closed.

46. On June 8, 2022, the undersigned submitted a "Formal Appeal" of the Defendant's decision to deny the Plaintiff's claim for the LSD benefit and provided additional information and reports that supported the Plaintiff's claim that he is permanently totally disabled from performing the skills required of a dentist.

47. Included with the Plaintiff's Formal Appeal was a Vocational Evaluation Report, dated April 30, 2022, completed by a Vocational Rehabilitation Consultant, Susan Rowe, M.A., CDMS, who stated in part,

> The Dictionary of Occupational Titles classifies the job of "Dentist" as follows:
>
> DOT#: 072.101-010
> * * *
> Reaching: Frequent (up to 66% of the workday)
> Handling: Frequent (up to 66% of the workday)
> Fingering: Frequent (up to 66% of the workday)
> Feeling: Frequent (up to 66% of the workday)

**From a vocational standpoint, it is my opinion based on my interview with Dr. Okonowski, along with a review of the medical records, he was not able to continue working as a General Dentist when he went off work in 2015. It is also my opinion he still is not able to work as a General Dentist.**

Dentistry is an occupation that requires excellent fine motor skills as it relates to upper extremity use. When performing procedures (fixing or removing damaged teeth, filling cavities, performing oral exams, measuring and fitting dental appliances, administering medication/local anesthetic) a dentist needs to have excellent grip strength and fine motor control to operate drills, use scalpels, use dental probes, mouth mirrors, syringes, etc. When considering the size of an average person's mouth, a dentist must be able to work with precision on an extremely small scale.

**A dentist must have superior manual dexterity skills to safely perform dental procedures. Manual dexterity is the ability to use one's hands in a skillful, coordinated way to grasp and manipulate objects and demonstrate small, precise movements.** Dr. Okonowski was struggling with left hand focal dystonia symptoms and started having trouble holding onto and manipulating dental tools and instruments. This is why he had to make the decision to end his career in dentistry. Dr. Grof diagnosed "mild" left hand dystonia. **Vocationally, even a "mild" impairment in the ability to use one upper extremity to perform manual dexterity and fine motor skills would rule out one's ability to work safely and effectively as a dentist. One mistake while performing a procedure (ex: dropping a syringe or drill in a patient's mouth) would be catastrophic and could result in extreme harm to a patient and a medical malpractice lawsuit.**

In addition to Dr. Okonowski's left hand dystonia, he was experiencing numbness and loss of function in his left foot. This problem was also impacting his ability to continue working as a dentist because he operated the foot pedal for the drill with his left foot. The foot pedal for the drill controls the speed of the drill and Dr. Okonowski was having difficulty keeping accurate speeds needed for performing safe procedures. **In my opinion, an individual who has numbness and loss of function in a foot that operates a drill being used in a patient's mouth should not be doing so. Dental drills can reach over 400,000 RPMs.**

I'd like to comment on Dr. Grof's report that made great mention of Dr. Okonowski's ability to play golf. In my opinion, playing golf and working as a dentist is not a legitimate comparison. Dentistry requires fine motor skills involving small hand actions that require precise, coordinated movements of small muscle groups. Golf is mostly a game of "gross motor" skills using large muscle groups. Gross motor skills are those which require more whole body movement involving the large (core stabilizing) muscles of the body. More importantly, mistakes or a bad day in golf can result in hurting one's pride or losing a bet. A mistake in a dental procedure can result in injury to a patient. Vocationally, there is no comparison. (Emphasis added).

48.　　In addition to the above vocational analysis, Plaintiff also underwent an independent

dentistry examination completed on May 31, 2022 by Erick Rupprecht, D.D.S.[4], FACD,

FICD, and who stated in part as follows,

> I additionally had a one hour and fifteen minute interview with Dr. Okonowski on the morning of May 25th. This interview was to familiarize me with the challenges he met with while attempting to practice dentistry and why he ultimately left the practice of dentistry. * * *
>
> My opinion will be limited to Dr. Okonowski's ability to practice his chosen profession of general dentistry and nothing further. I would however, comment on Dr. Grof's repeated mention of golf as a benchmark of sorts for dental practice disability. Golf and general dentistry have little in common. Success in golf is measured in yards while success in dentistry is measured in fractions of millimeters. Failure in golf means adding a stroke, failure in general dentistry can result in catastrophic injury to the patient. **Fine motor skills, vision, proprioception and tactile sensation are mandatory for the practice of general dentistry. Anything that detracts from this such as finger numbness, finger weakness, foot numbness (the foot controls the rheostat which controls the dental handpiece or drill) is an impairment to practicing general dentistry. A combination of the preceding would certainly disable a dentist from practicing general dentistry.**
>
> Historically dentists held in highest esteem by their colleagues for their clinical work are described as having "good hands". **The failure of the hands places patients at risk. In a new world where all dentists must wear gloves as PPE (which limits the ability to exquisitely feel) the challenge of numb finger tips and dystonic fingers is disabling. If a dentist is unable to feel where his left hand is or is unable to determine whether or not an instrument is where it should be in that hand can lead to extremely harmful results. Both hands working in tandem are needed for the practice of general dentistry. If the mirror hand loses control of the patient's tongue it can fall into the path of the handpiece (drill) which is turning at over 450,000 RPM. A drill in that situation would slice through tongue tissue like a hot knife through butter. The patient could suffer nerve damage and even the ability to speak clearly (in addition to suffering a painful injury) in this situation.** The rheostat (if controlled by a foot with numbness) may not be released quickly compounding the damage. Many additional disturbing scenarios could play out with Dr. Okonowski and his condition should he resume practice.
>
> **I don't believe Dr. Okonowski can safely practice general dentistry. He is ethically bound to value his patients' health and maintain it. If he cannot safely deliver care he should not practice.** He left the practice of general dentistry after consulting his physicians and garnering their agreement with his decision. His was a prudent and ethical decision based on his condition and on his concern for the health of his patients. (Emphasis added).

---

[4] Dr. Rupprecht has been a general dentist for 39 years in Grand Rapids, Michigan. He currently works as an educator teaching dental hygiene and dental assistant candidates at Grand Rapids Community College in Grand Rapids Michigan. He is also a member of both the American College of Dentistry and the International College of Dentistry. Dr. Rupprecht has also served on mediation panels for dental malpractice cases and has evaluated dental cases for both defendants and plaintiffs.

49. On September 7, 2022, DMS responded to the Plaintiff's Formal Appeal, and notified him that it had affirmed its original decision to deny his claim for the LDS benefit, and that its decision continued to be based on the IME report provided by Dr. Grof.

50. Plaintiff has exhausted the "Grievance Procedures" required by the Policy before bringing legal action.

## **Count I -- Breach of Contract**

51. Plaintiff incorporates by reference paragraphs 1 through 50 above, as if fully set forth herein.

52. The Policy is a legally-binding written contract between the parties and is supported by all of the necessary elements for a contract, i.e., offer, acceptance, mutual assent, and consideration.

53. Plaintiff has not breached the subject contract, and has performed all duties thereunder, including payment of all due premiums on the Policy for the benefits that Defendant is now unjustifiably denying.

54. The Plaintiff is undeniably disabled as defined by the Policy because he is unable to perform the substantial and material duties of his own occupation as a Dentist.

55. By refusing to honor the referenced terms and conditions of the contract, the Defendant has materially breached its contract with the Plaintiff, with the direct and proximate result that the Plaintiff has and will suffer actual pecuniary loss far in excess of the jurisdictional minimum of this Court.

56. The Plaintiff is due the unpaid Sickness and Injury Lump Sum Disability benefit, and therefore the Defendant owes the Plaintiff the amount of one-million dollars ($1,000,000.00), not inclusive of interest.

## **Prayer for Relief**

WHEREFORE, Plaintiff John G. Okonowski, D.D.S., respectfully prays for:

(A)     A judgment in his favor against the Defendant in the appropriate amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to redress Defendant's material breaches of the contract between the parties.

(B)     An Order instructing the Defendant to file, in proper bates-numbered form, a copy of the Policy and all documents constituting the Plaintiff's claim file with Defendant in order to constitute the settled administrative or claim file record in this proceeding.

(C)     A declaratory judgment resolving any collateral issues that might be invoked by the pleadings and/or discovery in this litigation.

(D)     An award of interest, costs and attorney fees as consistent with applicable law, and for such other and further relief that comports with substantial justice and fundamental equity.

Dated:  October 19, 2022

*/s/ Troy W. Haney*
Troy W. Haney (P48614)
HANEY LAW OFFICE, P.C.
Attorney for Plaintiff
330 East Fulton Street
Grand Rapids, MI 49503